IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
NORTHERN DIVISION

No. 2:12-cv-58-FL

| | |
|---|---|
| JOHN MICHAEL ROBINSON, SR., | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner of Social | ) |
| Security, | ) |
| | ) |
|     Defendant. | ) |
| _____ | ) |

**MEMORANDUM &
RECOMMENDATION**

This matter is before the Court upon the parties' Motions for Judgment on the Pleadings. DE's-22 & 23. The time for filing any responses or replies has expired, and, therefore, the motions are now ripe for adjudication. Pursuant to 28 U.S.C. § 636(b)(1), they have been referred to the undersigned for the entry of a Memorandum and Recommendation.

For the following reasons, it is RECOMMENDED that Plaintiff's Motion for Judgment on the Pleadings (DE-22) be DENIED, that Defendant's Motion for Judgment on the Pleadings (DE-23) be GRANTED, and that the final decision by Defendant be AFFIRMED.

## STATEMENT OF THE CASE

Plaintiff protectively filed an application for a period of disability and disability insurance benefits on May 27, 2009, alleging disability beginning January 2, 2009. Tr. 150. His claim was denied initially and upon reconsideration. *Id*. at 58-59. A video hearing was held before an Administrative Law Judge ("ALJ") who determined that Plaintiff was not disabled in a decision dated February 23, 2011. *Id*. at 19-28. The Social Security Administration's Office of Disability

Adjudication and Review denied Plaintiff's request for review on June 18, 2012, rendering the

ALJ's determination as Defendant's final decision. *Id.* at 1. Plaintiff filed the instant action on

August 20, 2012. DE-1.

## STANDARD OF REVIEW

This Court is authorized to review Defendant's denial of benefits under 42 U.S.C. §

405(g), which provides in pertinent part:

> The court shall have power to enter, upon the pleadings and transcript of
> the record, a judgment affirming, modifying, or reversing the decision of
> the Commissioner of Social Security, with or without remanding the cause
> for a rehearing. The findings of the Commissioner of Social Security as to
> any fact, if supported by substantial evidence, shall be conclusive….

42 U.S.C. § 405(g). "Under the Social Security Act, [the Court] must uphold the factual findings

of the Secretary if they are supported by substantial evidence and were reached through

application of the correct legal standard." *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996).

"Substantial evidence is . . . such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "It

consists of more than a mere scintilla of evidence but may be somewhat less than a

preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). "In reviewing for

substantial evidence, . . . [the court should not] undertake to re-weigh conflicting evidence, make

credibility determinations, or substitute . . . [its] judgment for that of the Secretary." *Craig*, 76

F.3d at 589. Thus, this Court's review is limited to determining whether Defendant's finding

that Plaintiff was not disabled is "supported by substantial evidence and whether the correct law

was applied." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).

## SUMMARY OF THE RECORD

Title II of the Social Security Act provides for the payment of insurance benefits to

persons who have contributed to the program and who suffer from a physical or mental

disability, as defined by the Act. 42 U.S.C. § 423(a)(1)(D). The Act defines "disability" as the

"inability to engage in <u>any</u> substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or

can be expected to last for a continuous period of not less than 12 months...." *Id.* § 423(d)(1)(A)

(emphasis added). More specifically, an individual is considered disabled under the Act

> only if his physical or mental impairment or impairments are of such
> severity that he is not only unable to do his previous work but cannot,
> considering his age, education, and work experience, engage in any other
> kind of substantial gainful work which exists in the national economy,
> regardless of whether such work exists in the immediate area in which he
> lives, or whether a specific job vacancy exists for him, or whether he
> would be hired if he applied for work.

*Id.* § 423(d)(2)(A).

Accordingly, the Social Security Administration has promulgated the following

regulations establishing a sequential evaluation process that must be followed to determine

whether a claimant is entitled to disability benefits:

> The five step analysis begins with the question of whether the claimant
> engaged in substantial gainful employment. 20 C.F.R. § 404.1520(b). If
> not, the analysis continues to determine whether, based upon the medical
> evidence, the claimant has a severe impairment. 20 C.F.R. § 404.1520(c).
> If the claimed impairment is sufficiently severe, the third step considers
> whether the claimant has an impairment that equals or exceeds in severity
> one or more of the impairments listed in Appendix I of the regulations. 20
> C.F.R. § 404.1520(d); 20 C.F.R. Part 404, subpart P, App. I. If so the
> claimant is disabled. If not, the next inquiry considers if the impairment
> prevents the claimant from returning to past work. 20 C.F.R. §
> 404.1520(e); 20 C.F.R. § 404.1545(a). If the answer is in the affirmative,

the final consideration looks to whether the impairment precludes the claimant from performing other work. 20 C.F.R. § 404.1520(f).

*Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2001). The ALJ followed the sequential evaluation in this case. First, the ALJ found that Plaintiff had not engaged in substantial gainful activity since January 2, 2009. Tr. 21. At step two, the ALJ found that Plaintiff had the following severe impairments: left shoulder osteoarthritis and impingement, attention deficit hyperactivity disorder, borderline intellectual functioning, and obesity. *Id.* The ALJ then determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* at 21-22. Specifically, the ALJ found that Plaintiff did not satisfy either Listing 12.02 or 12.06. *Id.* at 22-23. Next, the ALJ determined that Plaintiff had the residual functional capacity ("RFC")[1] to perform light work, with some additional limitations. *Id.* at 23. Specifically, the ALJ found that Plaintiff:

> can never climb ladders, ropes or scaffolds. The claimant can frequently climb ramps or stairs, balance, stoop, kneel, crouch or crawl. The claimant can never push or pull with his left upper extremity. Further, the claimant has no ability to reach with his left upper extremity, and he is limited to use of his right dominant upper extremity. Finally, the claimant is limited to simple, unskilled work.

*Id.* The ALJ then found that Plaintiff was unable to perform any past relevant work. *Id.* at 26. Based on the testimony of a vocational expert, however, the ALJ found that there were jobs that existed in significant numbers in the national economy that Plaintiff could perform. *Id.* at 26-27.

---

[1] An individual's RFC is what that person can still do despite physical and mental impairments. 20 C.F.R. § 404.1545(a).

Accordingly, the ALJ determined that Plaintiff had not been under a disability during the relevant time period. *Id*. at 27.

Plaintiff cites several errors in the ALJ's decision. First, Plaintiff argues that the ALJ erred in limiting counsel's cross-examination of the vocational expert at the hearing. DE-22-1 at 14. Second, Plaintiff contends that substantial evidence does not support the ALJ's RFC determination. *Id*. at 14-16. Next, Plaintiff objects to the weight the ALJ gave to the opinions of two treating physicians. *Id*. at 16. Finally, Plaintiff argues that the ALJ erred in his assessment of Plaintiff's credibility, and that this error tainted the hypotheticals presented to the vocational expert. *Id*. at 16-17. For the reasons discussed below, the ALJ applied the correct law and substantial evidence supports his conclusions; accordingly, Plaintiff's arguments are without merit.

## Overview of Medical Evidence

*Left Shoulder Injury*

Plaintiff has a lengthy history of left shoulder pain and malfunction, highlighted by several surgeries. He was diagnosed with impingement syndrome and a probable tear in January 2005. Tr. 384, 386. The medical records from this time note that Plaintiff additionally had a right shoulder arthroscopy about ten years prior, but that Plaintiff had no evidence of arthritis in the right shoulder. Tr. 384. Plaintiff's MRI showed extensive osteoarthritis of his left glenohumeral joint, along with a labrum tear and cyst. Tr. 384. A debridement was performed in March 2005, Tr. 506, but Plaintiff continued to experience pain thereafter. Tr. 380-81. Nine weeks after the procedure, Plaintiff was still unable to return to work, and his doctor discussed with him the need to "seek an occupation change that limits overhead reaching and lifting." Tr.

5

380. As of July 2005, Plaintiff was still in pain, was taking Percocet on a regular basis, and was referred to Dr. Nicholas for chronic pain management.[2] Tr. 374. Plaintiff was also referred to Dr. Neff for evaluation for a total shoulder replacement. *Id.*

Plaintiff underwent this arthroplasty in December 2005. Tr. 322. A car accident shortly after the surgery apparently caused the glenoid component to loosen, Tr. 343, which was confirmed in a March 2006 arthroscopy. Tr. 307-321. A revision of the total left shoulder replacement was performed to repair this problem in April 2006, and Plaintiff did well for some time after this surgery. Tr. 305, 297, 293. His doctor recommended not lifting, pushing, or pulling more than five pounds with the left arm, Tr. 295, but Plaintiff was unable to find other work and continued to perform relatively strenuous mechanical work, including changing tires. Tr. 293.

In October 2009, Plaintiff was referred to Dr. Brown for continued left shoulder pain. Tr. 278; *see also* Tr. 283, 285 (noting shoulder pain and deformation in August 2009). Dr. Brown concluded that Plaintiff likely again had a loose glenoid component, and informed him that it was "unlikely that any surgical procedure would provide any improvement in his range of motion. In addition, he is likely to have persistent pain at the left shoulder." Tr. 279. Dr. Brown

---

[2] Although Dr. Nicholas's letter in support of Plaintiff mentions this 2005 referral, the earliest record provided by Dr. Nicholas's practice is dated July 2, 2009. Tr. 282. Other references to pain management are peppered throughout Plaintiff's medical records, but the extent of his treatment with Dr. Nicholas from July 2005 to July 2009 is unclear. *See* Tr. 350 (January 2006 record stating that it was discussed with patient "that he needs pain management [doctor]"); Tr. 397 (December 2007 record stating: "Explained to patient that due to the chronic nature of his pain that will need to refer him to pain management. He is agreeable to this and wishes to be referred to Chesapeake."); Tr. 394 (July 2008 note stating "followed by pain management, pain doc is out of town"); Tr. 390-91 (August and November 2008 notes regarding Plaintiff's "switching Pain Management Doctors" and desire to "talk with doc about referral to another pain management"); Tr. 278 (October 2009 record noting that the patient "is being seen by pain management"); Tr. 440 (February 2010 record stating that Plaintiff had been referred to Atlantic Pain Management "and has yet to have first appointment with them").

6

did note that a revision surgery would "potentially" relieve some of the sharp pain, but that Plaintiff would be permanently restricted as to lifting and should not return to mechanic work. *Id.* A CT scan confirmed the loosening of the glenoid component in his left shoulder, as well as suboptimal humeral stem position. Tr. 485, 277. Dr. Brown noted that this was a "very difficult clinical problem" and that surgical options "may offer some partial relief of pain at best." Tr. 277. Plaintiff underwent total left shoulder revision in December 2009. Tr. 443; 489. A physical therapy assessment performed just after the surgery opined that Plaintiff did not have "impairments of function or activity that indicate continuing acute [physical therapy] intervention." Tr. 495. At his three month follow-up appointment in March 2010, Plaintiff had some weakness but had regained motion and stated that he was overall "pleased" with the results of the surgery. Tr. 438. In August 2010, Plaintiff reported that "the left shoulder pain that he was having before which he described as excruciating pain is now significantly relieved and that his shoulder feels quite good." Tr. 437. Dr. Brown did note that functionally the results of surgery were "fair to average" but that there was "excellent relief of pain so far." *Id.*

 *Pain Management*

 Since 2003, Plaintiff has been prescribed varying types of pain medication, including Vicodin, Percocet, Valium, and Roxicodone. *See, e.g.*, Tr. 387-427 (Carolina Family Practice records noting chronic pain and medication refills). As noted above, Plaintiff was referred to Dr. Nicholas in 2005, but Carolina Family Practice continued to follow him for chronic pain through 2009. *Id.* Plaintiff saw Dr. Nicholas prior to his 2009 shoulder surgery and reported that the oxycodone helped, Tr. 435, but experienced "quite a bit of pain" in the wake of his surgery and was having trouble sleeping. Tr. 434. In March 2010, however, Plaintiff informed Dr. Nicholas

that while he still had some residual pain, he felt that he was slowly improving and "has been doing well on [his] current regimen." Tr. 433. In June 2010, Plaintiff said he was still having pain but was "doing OK on oxycodone," and obtained medication renewals. Tr. 432. In September 2010, Plaintiff denied side effects and was "doing well with [his] current regiment." Tr. 531. Plaintiff additionally requested Motrin as an anti-inflammatory medication in December 2010. Tr. 530. In January 2011, Plaintiff saw Dr. Nicholas for hip pain, and was informed that x-rays showed severe osteoarthritis in the left hip. Tr. 529. At that time, Plaintiff was having increased pain at night, so Dr. Nicholas prescribed additional oxycodone "for this month only." *Id.* Plaintiff returned to Carolina Family Practice in May 2011 with reports of chronic pain, and informed them that he had taken himself off Roxicodone and could not afford to go to Dr. Nicholas. Tr. 535. He requested pain relief for morning and bedtime for left shoulder and hip pain, and was given Vicodin. *Id.*

*Testimony*

At the hearing, Plaintiff testified that he had completed only through ninth grade in school and that he went to special education classes. Tr. 38. He can read a newspaper but struggles with "sophisticated" words, and can write print but not cursive. *Id.* His sole line of work in his lifetime has been an auto mechanic. Tr. 39-41. Plaintiff also testified that he has trouble concentrating and trouble with anxiety, which medication "sometimes" does not control. Tr. 42. He tries to do housework and can push a vacuum cleaner and cook meals like spaghetti-os, but has trouble doing dishes, getting dressed, and washing his back. Tr. 43. He testified that his right arm also bothers him from overuse now that he cannot use his left arm. Tr. 44. Plaintiff reported that he takes eight pills per day, and additionally uses Motrin, Bengay, and Icy Hot for

8

his shoulder and hip. Tr. 45. Medications do not "relieve" his symptoms but taking them "calms [the pain] down" to where it does not bother him as badly, and he does not experience side effects. Tr. 45-46. Plaintiff also reported that he cannot reach above his head with his right arm, and cannot reach it to the side, in addition to his left arm limitations. Tr. 46. Plaintiff's wife testified that he has "trouble" with his hip and shoulder, and that he has trouble getting to the mailbox and back, as well as going up and down stairs. Tr. 49. She also reported that Plaintiff has reading comprehension difficulties and that he is "computer illiterate." Tr. 50.

*Consultative Examinations*

Dr. Holton performed a disability evaluation on August 12, 2009, prior to Plaintiff's most recent shoulder surgery. Tr. 286-89. As of that date, Plaintiff was taking oxycodone five times a day for his pain, and was also prescribed anxiety medication. Tr. 286. Plaintiff complained of poor concentration and described illiteracy and a history of special education classes. Tr. 287, 289. He had significant pain in his left shoulder and difficulty moving his left arm. Tr. 289. Dr. Holton concluded that Plaintiff had normal grip, that his hands and fingers had full range of motion, and that Plaintiff had normal gait and could squat and rise. *Id.*

Dr. Michael performed a psychological consultative exam on August 6, 2009. Tr. 290-292. He noted that Plaintiff was able to climb stairs and manipulate test items, and that Plaintiff was "visibly shaking throughout the initial part of the evaluation." Tr. 290. Plaintiff told Dr. Michael that he could not read or write and that his wife helps him with paperwork and handles financial matters. Tr. 290-91. Plaintiff also reported constant pain, and difficulty sleeping due to shoulder pain and nerves. Tr. 290. As such, Dr. Michael concluded that his pain and anxiety medication "may" affect his ability to relate to others and handle stress in a workplace. Tr. 291.

9

Dr. Michael also concluded that though Plaintiff was functioning in the borderline range of intelligence, he was able to remain focused during intellectual testing and was well motivated. Tr. 292. Although Plaintiff appeared anxious at first, he calmed down and did "appear capable of performing repetitive tasks that would not require the use of his shoulder." *Id.*

## ANALYSIS

### I. The ALJ Did Not Err In Limiting Counsel's Cross-Examination of the Vocational Expert.

Plaintiff first argues that the ALJ erred in not allowing his counsel "wide latitude" in cross-examination of the vocational expert ("VE"). DE-22-1 at 14. Specifically, Plaintiff claims that the ALJ "erroneously found that questions of the VE expert witness called for speculation," and incorrectly limited counsel's line of questioning. *Id.* At the hearing, the following colloquy took place:

> EXAMINATION OF VOCATIONAL EXPERT BY ATTORNEY:
>
> Q: Ms. Holler, if the Judge were to find all of the symptoms and conditions and limitations as described by the claimant in his testimony, if he were to find those to be true and credible, would there then by an[y] jobs?
>
> A: You better specify so that we know we're talking about the same thing.
>
> Q: Let me ask you. **From his testimony, what limitations or symptoms did you find** based on your experience and expertise as being limiting, vocationally limiting factors or limitations?
>
> A: Well, there's, there were many and I would have to include in there borderline illiteracy as well. You're just referring to the physical limitations?
>
> Q: Physical and mental, yes, ma'am, both.
>
> ALJ: Mr. Vincent, can you quantify that for Ms. Holler because right know you're asking her to do a lot of speculation?
>
> ATTY: Well, no, she's an expert, Your Honor. She's been admitted as an expert and she's, I think she's capable of such to identify from the

testimony based upon her expertise which factors and limitations to which he has testified to would limit the performance of any work. I think that goes to the heart of her expertise.

ALJ: But what you're doing is your asking her to put limitations on that which is really my job to do so, you know, I'm going to ask you to quantify that in a hypothetical for her so she can, you know, how do you see his, what do you see as his limitations?

ATTY: I can ask, well, okay. You're asking me to ask her what does she see as his limitations? She's the expert.

ALJ: No, I'm asking you, yeah, she's the expert, but she's here to take, take our questions regarding specific hypotheticals and a hypothetical individual and then respond to that and tell us whether there would be jobs for that person or not. And what I'm asking you to do is quantify what limitations you're putting on Mr. Robinson into a hypothetical so that she can answer that hypothetical. Is he going to be off task 20 percent or more in the workday? Is he going to miss two days or more of work per month? Is he limited to sedentary work or less than sedentary work? What are you asking her to respond to?

ATTY: **Well I'm just asking her to use her expertise and identify vocationally limiting symptoms.** I'm not an expert. I don't know what they would be. That, if I can't ask that question, then I guess I don't have any questions.

ALJ: Okay. All right. And I'm going to object to that question based on the fact that I think it calls for her to speculate which is not her job.

Tr. 54-55 (emphasis added).

Counsel's line of questioning, as embodied in Plaintiff's argument, fundamentally misconstrues the nature of the VE's role. "Vocational experts are not experts in [the medical field] who are qualified to render opinions on how the claimant's ailments might be reflected in his capabilities; rather, they are employment experts who know the mental and physical demands of different types of work." *Fisher v. Barnhart*, 181 F. App'x 359, 365 (4th Cir. 2006). Accordingly, identifying limitations is the ALJ's responsibility and is beyond the scope of the VE's expertise. *Poteat v. Shalala*, 909 F. Supp. 340, 344 (M.D.N.C. 1995) (finding that Plaintiff's proposed questions "improperly sought opinions from the vocational expert on what

11

Plaintiff's residual functional capacity was. The ALJ, not the vocational expert, has the responsibility for assessing a claimant's residual functional capacity."); *Eiker v. Astrue*, No. CBD-11-3584, 2013 WL 2149755, at *12 (D. Md. May 15, 2013) ("It is the ALJ's role to translate the claimant's medical impairments into functional limitations from which the vocational expert can determine whether work is available."); *accord Smith v. Astrue*, No. 3:07-cv-1674, 2008 WL 4414297, at *9 n.4 (D.S.C. Sept. 23, 2008). Once the ALJ has identified specific limitations, the VE's role is to testify regarding the impact of those limitations on the occupational base. *Poteat*, 909 F. Supp. at 344 ("The role of a vocational expert is to determine whether jobs exist in the national economy for a claimant with a <u>given</u> residual functional capacity.") (emphasis added); Kubitschek & Dubin, SOCIAL SECURITY LAW AND DISABILITY: LAW AND PROCEDURE IN FEDERAL COURT § 3:100 (2013 ed.) ("The only opinion that the vocational expert can reasonably offer is which jobs can be performed by an individual with particular functional and vocational characteristics.").

Here, rather than asking the VE which jobs could be performed by an individual with specific functional limitations, or to what extent an occupational base would be limited by the presence of such limitations, counsel asked the VE to draw conclusions from Plaintiff's testimony and "identify vocationally limiting symptoms." Tr. 55. Such an opinion is not within the purview of the VE's expertise, and the ALJ did not err in restricting this line of questioning.[3]

---

[3] Plaintiff also contends that this limitation of cross-examination "calls into question the neutrality of the ALJ." DE-22-1 at 14. When alleging bias, a plaintiff has a "heavy burden" of proof. *See Simpson v. Macon County, N.C.*, 132 F. Supp. 2d 407, 411 (W.D.N.C.2001)). The alleged bias must be evident from the record and not based on speculation or inference. *Hucks v. Colvin*, No. 2:12-cv-76, 2013 WL 1810658, at *7 (N.D. W. Va. Apr. 3, 2013) (citing *Navistar Int'l Trans. Corp. v. United States E.P.A.*, 941 F.2d 1339, 1360 (6th Cir. 1991)). Plaintiff's contention here is nothing more than speculation and is without merit.

*See Harris v. Matthews*, 430 F. Supp. 1335, 1340 (D. Md. 1977) (conduct of cross-examination

"rests in the sound discretion of the ALJ").

## II.    The ALJ Adequately Explained His Reasons For Granting Limited Weight to Certain Opinions Provided By Plaintiff's Treating Providers.

Plaintiff contends that the ALJ erred in not according "great weight" to the opinions of Dr.

Nicholas and Dr. Brown, both of whom had a treatment relationship with Plaintiff. DE-22-1 at

16.  Dr. Nicholas, Plaintiff's pain management doctor, submitted a letter in advance of the

hearing opining as follows:

> [Plaintiff] has been a patient of mine since July 27, 2005.[4]  He carries the following diagnoses:
>
> 1. History of severe osteoarthritis affecting left shoulder, status post left shoulder replacement with subsequent revisions.
>
> 2. Polyarthralgia secondary to severe osteoarthritis.
>
> 3. Depression.
>
> 4. Anxiety.
>
> Due to the extent of his multiple diagnoses, [Plaintiff] cannot stand, walk, or sit for any length of time, nor can be perform repetitive movements without aggravating his pain symptomatology.  Furthermore, his memory and concentration have been impaired secondary to a combination of pain, anxiety, and depression.  His condition has not improved at all over the course of time, and I do not expect any significant improvement in the future.
>
> In my professional medical opinion, he is unemployable and would be considered totally and permanently disabled.

Tr. 533. Additionally, Dr. Brown, who performed Plaintiff's most recent shoulder surgery, noted

in a February 9, 2010 record that he "believe[s] it is unlikely that John would be able to return to

any meaningful work for at least one year's timeframe.  He is currently pursuing disability

---

[4]  See note 2, *supra*.

13

application and I believe this is appropriate." Tr. 440.

The ALJ "afforded limited weight" to Dr. Brown's February 9, 2010 opinion that it was "unlikely" Plaintiff could return to any meaningful work for one year, and "afforded limited weight" to Dr. Nicholas's opinion that Plaintiff was "unemployable and . . . totally and permanently disabled." Tr. 25. The ALJ noted that Dr. Brown is an orthopedist and Dr. Nicholas's specialty is physical medicine and rehabilitation. *Id.* He accepted their opinions regarding the nature and degree of Plaintiff's left shoulder impairment, and limited Plaintiff's RFC to work activity that can be performed only with the right, dominant upper extremity. But the ALJ noted that jobs in the national economy are available that accommodate this limitation, and rejected that the left shoulder injury rendered Plaintiff completely disabled. Tr. 25-26. Moreover, the ALJ found that Dr. Nicholas's opinion that claimant's diagnoses inhibit his ability to "stand, walk, or sit for any length of time" was unsupported by either explanation or objective medical evidence in the record. Tr. 26. Finally, the ALJ found that Dr. Nicholas's opinion regarding Plaintiff's mental health impairments should be accorded "little weight" because Dr. Nicholas is not a specialist in mental health. *Id.* As discussed in more detail below, the ALJ did not err in giving these opinions limited weight.

As an initial matter, a medical source's opinion that a claimant is "disabled" or "unable to work" is not a "medical opinion" but is an opinion on an issue reserved to the Commissioner.[5] 20 C.F.R. § 404.1527(d). Accordingly, an ALJ is not required to give "any special significance"

---

[5] "Medical opinions are statements from physicians and psychologists or other acceptable medical sources *that reflect judgments about the nature and severity of your impairment*(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 404.1527(a)(2) (emphasis added). It is also noted that the terms "unemployable" and "disabled" are not coextensive. *See, e.g.*, 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1566(a) & (c).

to such an opinion. *Id.* Moreover, as discussed below, the ALJ applied the correct standard to his analysis of Dr. Nicholas's and Dr. Brown's opinions and supported his reasoning with ample explanation.

While "the treating physician rule generally requires a court to accord greater weight to the testimony of a treating physician, the rule does not require that the testimony be given controlling weight." *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992). Rather, "a treating physician's opinion on the nature and severity of the claimed impairment is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." *Mastro*, 270 F.3d at 178. Thus, "[b]y negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590. In sum, "an ALJ's determination as to the weight to be assigned to a medical opinion will generally not be disturbed absent some indication that the ALJ has dredged up specious inconsistencies or has not given good reason for the weight afforded a particular opinion." *Koonce v. Apfel*, 166 F.3d 1209, 1999 WL 7864, at *2 (4th Cir. 1999) (internal citations omitted).

When the ALJ does not give the opinion of a treating physician controlling weight, he must weigh the opinion pursuant to the following non-exclusive list: 1) the length of the treatment relationship and the frequency of examination; 2) the nature and extent of the treatment relationship between the physician and the claimant; 3) the supportability of the physician's opinion; 4) the consistency of the opinion with the record; and 5) whether the physician is a specialist. 20 C.F.R. § 404.1527(c)(1)-(6); *see also Johnson v. Barnhart*, 434 F.3d 650, 654 (4th

15

Cir. 2005). The ALJ is not required to explicitly discuss each of these factors in his decision. *Warren v. Astrue*, No. 5:08-cv-149, 2009 WL 1392898, at *3 (E.D.N.C. May 18, 2009). The ALJ's decision must, however, "contain specific reasons for the weight given to the treating source's medical opinion, supported by substantial evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96–2p, 1996 WL 374188, at *5 (Jul. 2, 1996); *see also Farrior v. Astrue*, No. 7:10-cv-164, 2011 WL 3157173, at *4 (E.D.N.C. Jun. 1, 2011), *adopted by Farrior v. Astrue*, 2011 WL 3157150 (E.D.N.C. Jul. 26, 2011).

The ALJ's decision here satisfies this standard. He explained the weight given to the opinions of Dr. Brown and Dr. Nicholas, along the reasons for that weight. The ALJ also took into account the treatment relationship and the relevant specialties, but ultimately concluded that the opinions regarding Plaintiff's disability other than his left shoulder impairments were not supported in the record and intruded into the province of the ALJ's role.[6] Tr. 26. Dr. Nicholas's opinion that Plaintiff could not stand, walk or sit for any length of time, nor perform repetitive movements, has no support in any of Plaintiff's medical records. Moreover, while it appears that Dr. Nicholas did prescribe Plaintiff's Xanax, he is not a mental health specialist and did not identify functional limitations stemming from Plaintiff's anxiety. In sum, the ALJ's findings were supported by substantial evidence, and this assignment of error is without merit. *See Koonce*, 1999 WL 7864, at *2.

_____

[6] The ALJ did, however, give great deference to the opinions regarding the limitations caused by Plaintiff's left shoulder injury. Tr. 25.

## III. The ALJ's Assessment Of Plaintiff's Credibility Is Entitled To Deference And Is Supported By Substantial Evidence.

Plaintiff additionally argues that the ALJ failed to properly assess his credibility. DE-22-1 at 16. Plaintiff's arguments here are largely conclusory and convoluted. First, he states that the "ALJ essentially determined that John was not able to use either arm to perform related work activity," which is inaccurate.[7] *Id.* Next, he asserts, without citation to medical records, that the "medical evidence" confirms that he is "illiterate or borderline illitera[te]," experiences "poor concentration," and "has [ADHD]." *Id.* But the only reference to these impairments derives from Plaintiff's self-report to consultative examiners and in his testimony, not from "medical evidence" in the record.[8] *See, e.g.*, Tr. 24-25. Nonetheless, to the extent that Plaintiff argues that the ALJ erroneously disregarded Plaintiff's subjective assertions of pain and other disabling symptoms, his argument will be considered.

Where a claimant makes subjective assertions of pain, the ALJ applies a two-step process. *Craig*, 76 F.3d at 594. "First, there must be objective medical evidence showing 'the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged.'" *Id.* (quoting 20 C.F.R. § 404.1529(b)) (emphasis omitted). Second,

> [i]t is only *after* a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to

---

[7]   See note 9, *infra*.

[8]   As to Plaintiff's ADHD, the fact of diagnosis merely establishes the existence of a medically determinable impairment and does not establish whether or not the impairment is disabling. *Aytch v. Astrue*, 686 F. Supp. 2d 590, 598-99 (E.D.N.C. 2010) (citing *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988)); *see also Mecimore v. Astrue*, No. 5:10-CV-64, 2010 WL 7281096, at *5 (W.D.N.C. Dec. 10, 2010) (evidence of diagnosis does not establish disability and is not tantamount to evidence showing functional limitations stemming from the diagnosed impairment).

cause the pain claimed, that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated.

*Id.* at 595. At this second step, the ALJ considers "the entire case record, including the objective medical evidence, the individual's own statements . . . and any other relevant evidence in the case record." SSR 96-7p, 1996 WL 374186, at *4 (Jul. 2, 1996). Because "symptoms [can] sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone," all other information about symptoms, including statements of the claimant, must be "carefully consider[ed]" in the second part of the evaluation. 20 C.F.R. § 404.1529(c)(3). The extent to which a claimant's statements about symptoms can be relied upon as probative evidence in determining whether the claimant is disabled depends on the credibility of the statements. SSR 96-7p. "Although a claimant's allegations about [his] pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence." *Craig*, 76 F.3d at 595.

After reviewing the medical records and Plaintiff's testimony, the ALJ found as follows:

> [T]he claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

Tr. 24. In particular, the ALJ accepted Plaintiff's contentions, as consistent with the medical evidence, that his left shoulder use is significantly restricted, and took that into account in crafting the RFC. *Id.* But the ALJ found that any limitations imposed by Plaintiff's ADHD were not as severe as alleged, because his medical records showed no history of difficulties caused by

18

the ADHD. *Id.* The ALJ also noted that the consultative examiner considering Plaintiff's psychological health only opined that Plaintiff "may" have some limitation on handling stress in the workplace, due to the effects of his medications. Tr. 25; Tr. 291. In addition, the ALJ found that limitations caused by Plaintiff's intellectual functioning were not as severe as alleged, but found that a limitation to simple, unskilled work was appropriate. Tr. 25.

The ALJ's findings concerning the subjective complaints of Plaintiff's impairments are entitled to "great weight," because he had "the opportunity to observe the demeanor and to determine the credibility of the claimant." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984). An ALJ's credibility determination therefore "should be accepted by the reviewing court absent exceptional circumstances." *Eldeco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (4th Cir. 1997) (quoting *NLRB v. Air Products & Chemicals, Inc.*, 717 F.2d 141, 145 (4th Cir. 1983)); *see also Meadows v. Astrue*, No. 5:11-cv-63, 2012 WL 3542536, at *9 (W.D. Va. Aug. 15, 2012) (upholding ALJ's credibility determinations where they were neither unreasonable nor contradicted by other findings). Here, the ALJ's findings were reasonable and supported by substantial evidence. Accordingly, the findings are entitled to deference and Plaintiff's assignment of error in this regard is without merit.

**IV.    The ALJ's RFC Determination Was Supported By Substantial Evidence.**

Plaintiff additionally objects to the ALJ's RFC determination, arguing that his RFC is actually "less than sedentary work." DE-22-1 at 16. He also argues that Plaintiff's additional limitation of minimal use of his left upper extremity disqualifies him from all light work, because

19

light work may involve "frequent lifting or carrying." DE 22-1 at 15.[9]  Plaintiff fails to note that

the ALJ took into consideration that Plaintiff did not have the RFC to perform the full range of

light work, and consulted the VE to "determine the extent to which [Plaintiff's additional

limitations] erode the unskilled light occupational base." Tr. 27.  Applying this RFC, the VE

testified that the jobs that she identified in the national economy could be performed by an

individual with Plaintiff's RFC, i.e., an individual who was limited to use of only his right

dominant upper extremity.  Tr. 52-53.  Moreover, Plaintiff does not identify any specific

supporting evidence of limitations greater than light work, merely proffering the unadorned

argument that "it is certainly reasonable to believe that [he] would be off task 20% of the

workday and miss two or more days per month."  *See id.*; *cf. Mecimore*, 2010 WL 7281096, at

*6 ("Plaintiff has not adduced any evidence that she experiences greater limitations than those

assessed by the ALJ").  Thus, this argument essentially boils down to the contention that the ALJ

incorrectly weighed the evidence before him and failed to accept Plaintiff's testimony.  Although

Plaintiff may disagree with the determinations made by the ALJ after weighing the relevant

factors, the role of this Court is not to undertake to re-weigh conflicting evidence, make

credibility determinations, or substitute its judgment for that of the Secretary.  *Craig*, 76 F.3d at

589; *see also Shively*, 739 F.2d at 989.  Because that is what Plaintiff requests this Court do, his

argument is without merit.  The ALJ applied the correct legal standard with respect to his

determination of Plaintiff's RFC, and substantial evidence supports his conclusion.  *See Craig*,

_____

[9] Plaintiff also appears to contend that the hypothetical suggested by the ALJ incorporates "limited use of the dominant upper right extremity," and therefore "cannot use either arm for basic work activities." DE-22-1 at 15. Plaintiff misreads the ALJ's RFC determination, which states that Plaintiff is "limited *to* use of the dominant upper right extremity").  *See* Tr. 25 (emphasis added).

76 F.3d at 589; ("Where the evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on" the Commissioner and the ALJ, not the Court.).

Finally, Plaintiff argues that the ALJ's hypothetical questions did not accurately set forth Plaintiff's impairments. *See* DE-22-1 at 17. Here, the hypothetical question posed to the VE by the ALJ was based on a RFC determination supported by substantial evidence, as summarized above, and therefore accurately reflected all of Plaintiff's limitations. The ALJ is required only to "pose those [hypothetical questions] that are based on substantial evidence and accurately reflect the plaintiff's limitations." *France v. Apfel*, 87 F. Supp. 2d 484, 490 (D. Md. 2000); *see also Kearse v. Massanari*, 73 F. App'x 601, 604 (4th Cir. 2003). Accordingly, Plaintiff's argument in this respect fails as well.

## CONCLUSION

For the aforementioned reasons, it is RECOMMENDED that Plaintiff's Motion for Judgment on the Pleadings (DE-21) be DENIED, that Defendant's Motion for Judgment on the Pleadings (DE-22) be GRANTED, and that the final decision by Defendant be AFFIRMED.

SO RECOMMENDED in Chambers at Raleigh, North Carolina on Thursday, November 21, 2013.

_____
WILLIAM A. WEBB
UNITED STATES MAGISTRATE JUDGE